JMM:LTG

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M13 1066

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

CARMINE MANDARANO,

        DEFENDANT.

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR AN
ARREST WARRANT

(21 U.S.C. § 841(a)(1))

- - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      ANTON C. KOHUT, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed and acting as such.

      In or about and between May 2010 and April 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CARMINE MANDARANO, did knowingly and intentionally distribute controlled substances, which offenses involved substances containing oxycodone, methadone, and fentanyl, Schedule II controlled substances, and Suboxone and hydrocodone, Schedule III controlled substances, without a legitimate medical purpose.

      (Title 21, United States Code, Section 841(a)(1))

1

The source of my information and the grounds for my belief are as follows:[1]

1. I have been a Special Agent with DEA for approximately 16 years. I am currently assigned to the Long Island District Office. During my tenure with the DEA, I have participated in numerous narcotics investigations in which prescriptions for Schedule II and Schedule III controlled substances have been issued by doctors to patients outside the usual course of professional practice and not for a legitimate medical purpose.

2. I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel concerning the investigation described herein. I have also conferred with a medical doctor who is a pain management specialist about this investigation.[2]

**INTRODUCTION**

3. Among other duties, I am participating in an investigation of the defendant CARMINE MANDARANO, a medical doctor,

---

[1] Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not set forth all of the facts and circumstances of which I am aware.

[2] Any statements attributable to individuals herein are set forth in sum and substance and in part.

with a self-described concentration in asthma, allergies, immunology and smoking cessation, for the illegal issuance of hundreds of prescriptions for Schedule II and Schedule III controlled substances outside the usual course of professional practice and not for a legitimate medical purpose.

**THE DISTRIBUTION OF CONTROLLED SUBSTANCES GENERALLY**

4.  The Controlled Substances Act, 21 U.S.C. §§ 801 et seq., and regulations promulgated thereunder, classify controlled substances in five schedules. Schedule I drugs, including, for example, heroin and LSD, do not have an acceptable medical use in the United States. Schedule II through Schedule V drugs have acceptable medical uses. The medical use of substances in Schedule II, including, for example, oxycodone, is severely restricted because such drugs have a high abuse potential. Substances in Schedule III, including, for example, Vicodin, have an abuse potential less than those in Schedule II, but more than Schedule IV controlled substances, and so forth. Schedule V drugs consist primarily of preparations containing limited quantities of certain narcotics and stimulant drugs.

5.  Pursuant to 21 C.F.R. §§ 1306.11(a) and 1306.21(a), a controlled substance listed in Schedules II, III, IV or V, that is a prescription drug, as determined under the Food, Drug & Cosmetics

3

Act, 21 U.S.C. §§ 301, et seq., may be dispensed only if prescribed by an authorized practitioner.

6. 21 C.F.R. § 1306.04 sets forth the purpose of the issuance of a prescription. It says, in pertinent part, in order for "[a] prescription for a controlled substance to be effective, [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner...[a]n order purporting to be a prescription issued not in the usual course of professional treatment...is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

7. Oxycodone hydrochloride (oxycodone), methadone, and fentanyl are semi-synthetic opioid analgesic medications, and Schedule II controlled substances, generally prescribed for the relief of moderate to severe pain.

8. Hydrocodone (Vicodin) is a semi-synthetic opioid analgesic medication, and Schedule III controlled substance, generally prescribed for the relief of moderate to severe pain.

9. Suboxone is a semi-synthetic opioid analgesic

4

medication, and Schedule III controlled substance, generally prescribed for the treatment of opioid addiction.

### BACKGROUND OF THE INVESTIGATION

10. In the fall of 2012, the DEA began an investigation into the defendant MANDARANO'S practices after receiving a complaint from a drug treatment professional, hereinafter referred to as John Doe (JD), who works in the New York metropolitan area. JD reported that several clients at various drug treatment programs identified defendant MANDARANO as a doctor from whom it was "easy" to obtain prescriptions for oxycodone. These clients were being treated for oxycodone addiction at the time JD received and reported this information.

11. Thereafter, the DEA obtained records from the New York State Bureau of Narcotics Enforcement (BNE) for prescriptions written by defendant MANDARANO between 2010 and 2012. In that time period, defendant MANDARANO wrote prescriptions for over 308,000 oxycodone pills, which is an extremely high number for a sole family practitioner, especially in light of the defendant MANDARANO'S specialty area: asthma, allergies, immunology and smoking cessation.

12. On April 19, 2013, the Honorable William D. Wall signed a search warrant authorizing the DEA to search defendant MANDARANO'S medical office, and permitted the seizure of patient

5

files as evidence of controlled substance offenses. All available patient files were seized on that day and thereafter reviewed by DEA personnel.

**PROBABLE CAUSE**

13. On March 26 and 27, 2013, I interviewed a patient of defendant MANDARANO's hereinafter referred to as PT #1. PT #1 indicated s/he has been a pain management patient of defendant MANDARANO's for approximately 5 years. According to PT #1 s/he was in a car accident in 2008 and suffered from regional sympathetic disorder (RSD), a chronic pain condition. PT #1 advised s/he has been prescribed various opiates by defendant MANDARANO over the past 5 years. A review of PT #1's file, seized pursuant to the search warrant, reveals that PT #1 tested positive for heroin, morphine and hydrocodone in March 2012. While none of these substances were issued to PT #1 by defendant MANDARANO, defendant MANDANARO continued to prescribe oxycodone to PT #1. Thereafter, in late 2012, PT #1 advised that s/he voluntarily checked into an inpatient drug treatment facility as PT #1, by his/her own account, was addicted to oxycodone and required treatment. In the treatment facility, PT #1 was prescribed Suboxone and weaned off of all other opioids, including oxycodone. After being released from drug treatment, PT #1 returned to defendant MANDARARO and told defendant MANDARANO about

2

the addiction and drug treatment and then requested more pain medication. PT #1's medical file contains an entry documenting PT#1's drug addiction and treatment. Even knowing of PT #1's addiction and treatment for opioids, defendant MANDARANO thereafter issued prescriptions to PT #1 for oxycodone, fentanyl and methadone between November 16, 2012 and January 21, 2013. According to PT #1, throughout the time PT #1 was seeing defendant MANDARANO, defendant MANDARANO never discussed with PT #1 a strategy for discontinuing opioid therapy, commonly referred to as a treatment plan. Not surprisingly, the patient file is devoid of any reference to a treatment plan for PT #1.

14. I have consulted with Seth Waldman, M.D., a pain management specialist and the Director of the Division of Pain Medicine at the Hospital for Special Surgery in New York City. Dr. Waldman opined that the prescriptions issued between November 16, 2012 and January 21, 2013, after PT #1 was released from the drug treatment facility for opiate addiction, were not issued for a legitimate medical purpose. Dr. Waldman advised that because defendant MANDARANO was aware of PT #1's addiction and treatment, any potential benefit from the continued use of opioids is substantially outweighed by the danger of dependence and addiction to the opioids and in issuing these prescriptions, defendant

3

MANDARANO acted outside the scope of the usual course of professional practice. Finally, Dr. Waldman advised that pain management doctors and their patients regularly discuss and document concrete treatment plans which include strategies for the ultimate discontinuation of opioid therapy if indicated.

15. In July 2013, Dr. Waldman reviewed the file of a patient of defendant MANDARANO'S, hereinafter referred to as PT #2. This file was seized from defendant MANDARANO'S office during the execution of the search warrant. The file reveals that PT #2 began to see defendant MANDARANO in July 2009, claiming pain from a rib fracture and general back pain. At the onset of treatment, PT#2's file contained no x-rays supporting the existence of the claimed fracture. However, defendant MANDARANO prescribed oxycodone to PT #2 on a regular basis over approximately a four-year period. PT #2's file reveals that, in May 2010, PT #2 was administered a drug test which revealed the presence of cocaine and hydrocodone (commonly known as Vicodin) but was negative for oxycodone. Defendant MANDARANO was not prescribing hydrocodone to PT #2. This is significant, according to Dr. Waldman, as PT #2's drug test should have been positive for oxycodone (what the defendant was prescribing to PT #2) and should have been negative for hydrocodone (as this was not being prescribed to PT #2 by the defendant or any other doctor

4

according to the file). Dr. Waldman opined that a negative oxycodone drug test result is a "red flag" as it is strong evidence suggesting that the patient may not be taking the medication but diverting it, or, abusing the medication, causing the patient to run out or medication early. Moreover, according to Dr. Waldman, a positive drug test for other controlled substances not being issued by the treating physician and a positive drug test for illicit substances, such as cocaine, are also "red flags" which call into question the medical necessity of any subsequent prescriptions. However, defendant MANDARANO continued to issue PT #2 oxycodone prescriptions for the next three years. Then, in July 2011, defendant MANDARANO received a letter from the New York State Department of Health advising him that PT #2 was "doctor shopping" or receiving oxycodone from multiple practitioners between March 2011 and May 2011. Defendant MANDARANO maintained this letter in PT #2's file. However, defendant MANDARANO continued to prescribe oxycodone to PT #2 as the defendant MANDARANO noted in the file "patient promises to only get meds from me." In March 2013, PT #2 was administered a drug test which revealed the presence of hydrocodone (Vicodin) but was negative for oxycodone. Defendant MANDARANO wrote "failed urine, OUT" in his file. However, a review of BNE records reveal that defendant MANDARANO prescribed hydrocodone to PT #2 on three

5

occasions after March 2013. Dr. Waldman opined that that all prescription issued by defendant MANDARANO to PT #2 after May 2010 were issued outside the usual course of professional practice and not for a legitimate medical purpose.

16. In July 2013, Dr. Waldman reviewed the file of a patient of defendant MANDARANO'S, hereinafter referred to as PT #3. This file was seized from defendant MANDARANO'S office during the execution of the search warrant. The file reveals that PT #3 began to see defendant MANDARANO in August 2011, claiming opioid dependency, as defendant MANDARANO is authorized by the DEA to treat opiate dependency by issuing prescriptions for Suboxone. On January 21, 2012, PT #3's file reveals a notation that says "patient states he sold the Suboxone 8mg $10-$15." Both on that date and thereafter, defendant MANDARANO issued 18 more prescriptions for Suboxone to PT #3, for $100 a prescription. Moreover, on January 17, 2013, PT #3 tested positive for Suboxone, oxycodone and marijuana, however, defendant MANDANARO continued to prescribe Suboxone to PT #3. Dr. Waldman opined that any Suboxone prescriptions issued to PT #3 on or after January 21, 2012 were issued without a legitimate medical purpose.

17. According to PT #3, the defendant's other patients and an employee of defendant MANDARANO'S, MANDARANO only accepted

6

cash from patients in exchange for Suboxone prescriptions. According to witnesses, defendant MANDARANO took the Suboxone payments, pocketed them, and, unlike cash copayments and checks, did not have the office staff deposit the Suboxone payments into the business checking account.

WHEREFORE your affiant respectfully requests that a warrant be issued for the defendant CARMINE MANDARANO so that he may be dealt with according to law.

*/s/ Anton Kohut*
Anton Kohut
Special Agent, DEA

Sworn to before me this
9th day of December, 2013

*/s/*
THE HONORABLE ARLENE R. LINDSAY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

7